**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

KEVIN B.,

               Plaintiff,

     v.

ANDREW M. SAUL,
Commissioner of Social Security,

             Defendant.

Case No. 19 C 1655

Magistrate Judge Sunil R. Harjani

## MEMORANDUM OPINION AND ORDER

Plaintiff Kevin B.[1] seeks judicial review of the final decision of the Commissioner of Social Security finding him ineligible for Disability Insurance Benefits ("DIB") under the Social Security Act. Both parties have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, Kevin's motion [15] is granted in part and denied in part, and the Commissioner's motion [23] is denied. For the reasons set forth below, the ALJ's decision is reversed and this case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

## BACKGROUND

In March 2010, Kevin was working as a part-time fitness instructor. (R. 870-72). Kevin testified that around that time he began struggling to get to work on time, due to an inability to turn his car key and tie his shoes. *Id.* at 870. According to Kevin, about halfway through a fitness class, he would begin feeling like lightning bolts were going down his

---

[1] Pursuant to Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff by his first name and the first initial of his last name or alternatively, by first name.

arms and into his hands, which almost felt like they were on fire. *Id.* Kevin stopped working as a fitness instructor right before his cervical spinal surgery in November 2010. *Id.* at 871. That surgery was his second cervical spinal surgery; the first took place in 2004 and resulted in hypoxic ischemic encephalopathy. *Id.* at 211, 328. Kevin testified that he did not get any relief from his November 2010 surgery, nor the physical therapy or pain medications that his doctors prescribed. *Id.* at 872, 874-75, 975, 977. Kevin reported that he continues to have pain in his arms and that he closes his hands because opening them is painful. *Id*. at 874. This arm and hand pain, according to Kevin, leads to problems with reaching, gripping, lifting, standing, walking, and more. *Id.* at 874, 877, 878, 879-80, 887. In addition to his physical ailments, Kevin stated that he suffers from depression and panic attacks, and that he experiences problems with memory and concentration. *Id*. at 883-86.

Kevin filed for a period of disability and disability insurance benefits on November 29, 2010, alleging disability beginning May 4, 2009. (R. 147-48). Kevin's claim was initially denied on April 21, 2011 and upon reconsideration on July 27, 2011. *Id.* at 58, 59. Upon Kevin's written request for a hearing, he appeared and testified at a hearing held on August 8, 2012 before ALJ John Mondi. *Id.* at 40-56. The ALJ issued an unfavorable decision on September 4, 2012. *Id.* at 32. Kevin successfully appealed the September 4, 2012 decision to the United States District Court for the Northern District of Illinois. *Id.* at 945-56. The Appeals Council remanded the case on September 29, 2016. *Id.* at 961-62. ALJ Edward Studzinski held a subsequent hearing on February 3, 2017. *Id.* at 860-907. At the subsequent hearing, the ALJ[2] heard testimony from Kevin and a vocational expert, Gary Wilhelm. *Id* at 895-906.

---

[2] For the remainder of the opinion, "the ALJ" denotes ALJ Edward Studzinski.

On August 3, 2017 the ALJ issued a second decision denying Kevin's application for disability benefits. (R. 847-48). At the outset, the ALJ determined that Kevin met the last insured status requirements of the Social Security Act on March 31, 2011. *Id.* at 831.[3] The opinion followed the required five-step evaluation process. 20 C.F.R. § 404.1520. At step one, the ALJ found that Kevin had not engaged in substantial gainful activity from March 1, 2010, the alleged onset date, through March 31, 2011, the last insured date. *Id.* at 831. At step two, the ALJ found that Kevin had the severe impairments of degenerative disc disease and residuals of cervical spine surgery including plexopathy, neuritis, chronic pain, depression, and anxiety. *Id.* At step three, the ALJ determined that Kevin did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). *Id.*

The ALJ then concluded that Kevin retained the residual functional capacity ("RFC") to:

> Lift and/or carry up to 10 pounds occasionally and lighter weights frequently, and has no limitations in his ability to sit, stand, or walk throughout an 8 hour workday. He can occasionally push or pull with either upper extremity. The claimant can occasionally climb ramps and stairs, and he can occasionally stoop, kneel, balance, crouch and crawl, but he can never climb ladders, ropes or scaffolds. The claimant can perform gross manipulation frequently but not constantly, and is incapable of forceful grasping or torqueing. He can perform fine manipulation occasionally, and for no more than 10 minutes without interruption. He is incapable of precision fine manipulation. He is not capable of precision feeling. He has no limitation in his ability to reach up to 75% of the normal range of motion in all directions. He can reach from 75% to 100% of normal range of motion in all directions. He can reach from 75% to 100%

---

[3] To be eligible for DIB, a claimant must show that he was disabled as of his date last insured. *See Shideler v. Astrue*, 688 F.3d 306, 311 (7th Cir. 2012).

3

of normal range of motion in all directions including overhead only occasionally, and only while bearing less than 10 pounds. The claimant is limited to working in non-hazardous environments, i.e., no driving at work, operating moving machinery, working at unprotected heights or around exposed flames and unguarded large bodies of water, and he should avoid concentrated exposure to unguarded hazardous machinery. The claimant is further limited to simple, routine tasks, work involving no more than simple decision-making, no more than occasional and minor changes in the work setting, and work requiring the exercise of only simple judgment. He can work at an average production pace, but not at a significantly above average or highly variable pace. He is unable to work in crowded, hectic environments.

(R. 833-34). The ALJ next determined, at step four, that Kevin did not have any past relevant work. *Id.* at 846. At step five, the ALJ found that there were jobs that exist in significant numbers in the national economy that Kevin could perform. *Id.* Specifically, the ALJ found Kevin could work as a surveillance systems monitor, call out operator, or a cutter and paster. *Id.* at 847. Because of this determination, the ALJ found that Kevin was not disabled. *Id.* The Appeals Council denied Kevin's request for review on January 17, 2019, leaving the ALJ's decision as the final decision of the Commissioner. *Id.* at 815; *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018).

## DISCUSSION

Under the Social Security Act, a person is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine disability within the meaning of the Social Security Act, the ALJ conducts a sequential five-step inquiry, asking: (1) Is the claimant presently unemployed? (2) Does

the claimant have a severe impairment? (3) Does the claimant's impairment meet or equal an impairment specifically listed in the regulations? (4) Is the claimant unable to perform a former occupation? and (5) Is the claimant unable to perform any other work in the national economy? *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "An affirmative answer leads either to the next step, or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski*, 760 F.2d at 162 n.2.

Judicial review of the ALJ's decision is limited to determining whether it adequately discusses the issues and is based upon substantial evidence and the proper legal criteria. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009); *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In reviewing an ALJ's decision, the Court may not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (internal quotation marks and citation omitted). Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge from the evidence and h[is] conclusion[s]." *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal citation and quotations omitted); *see also Fisher v. Berryhill*, 760 F. App'x 471, 476 (7th Cir. 2019) (explaining that the "substantial evidence" standard

requires the building of "a logical and accurate bridge between the evidence and conclusion"). Moreover, when the ALJ's "decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

Kevin attacks the ALJ's decision on four grounds: (1) the ALJ's finding that Listing 1.02 (Major dysfunction of a joint) is not met; (2) the ALJ's accounting for Kevin's limitations in concentration, persistence, or pace; (3) the ALJ's analysis of Kevin's subjective symptom allegations; and (4) the ALJ's assessment of opinion evidence. *See* Doc. [16]. As discussed further below, Kevin has failed to identify any errors meriting remand with respect to the ALJ's listing analysis, mental RFC, and weighing of medical opinions. However, Kevin has highlighted significant problems with the ALJ's subjective symptom analysis. The Court could not follow the ALJ's analysis to conduct a meaningful review, and all of the ALJ's apparent reasons for discounting Kevin's testimony were invalid. The Court accordingly remands the ALJ's decision because the subjective symptom analysis in this case was patently wrong.

## A.     Listing 1.02 (Major Dysfunction of Joint)

The ALJ began his listing analysis by stating that he had "carefully considered the claimant's impairments using Listing 1.02." (R. 831). The ALJ then described Listing 1.02 and specifically noted that Listing 1.02 "requires lost ability to perform fine and gross movements in both upper extremities." *Id.* The ALJ next explained that, as would be discussed later in his analysis, the record did not reflect that level of severity. *Id.* As support, the ALJ pointed to Kevin's ability to drive, prepare light meals, and perform daily activities, as well as Kevin's ability to move both upper extremities, as observed by the

ALJ at the hearing. *Id.* In sum, the ALJ concluded that "the record does not support an inability to use the upper extremities effectively." *Id.* In addition, the ALJ stated that Kevin's musculoskeletal impairments did not meet or equal the requirements of Listings 1.02 or 1.04 because Kevin is "able to use both his right and left upper extremities effectively and is able to ambulate effectively." *Id.*

In the third step of the ALJ's sequential analysis, the ALJ must consider whether any of the claimant's impairments meets or equals an impairment specifically listed in the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). "If a claimant has an impairment that meets or equals an impairment found in the Listing of Impairments, a claimant is presumptively eligible for benefits." *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015) (citing 20 C.F.R. § 404.1520(d)). To demonstrate that a listing is met or equaled, the claimant bears the burden of showing that his impairment satisfies "all of the various criteria specified in the listing." *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (citation omitted). When considering if a claimant's impairment meets or equals a listing, the ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir.2004); *see also Minnick*, 775 F.3d at 935-36 (7th Cir. 2015) (rejecting ALJ's 2-sentence listing analysis as being "the very type of perfunctory analysis [the Seventh Circuit has] repeatedly found inadequate to dismiss an impairment as not meeting or equaling a Listing"). And as with all analyses by the ALJ, the ALJ must "build a logical bridge from the evidence to [ ] conclusion." *Minnick*, 775 F.3d at 935.

Listing 1.02 provides:

> 1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g.,

subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

or

B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02.

Section 1.00B2c states that the "[i]nability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living." 20 CFR Pt. 404, Subpt. P, App. 1, § 1.00B2c. Examples "include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level." *Id*.

Here, the ALJ's analysis with respect to Listing 1.02 was adequate. The ALJ expressly addressed and described Listing 1.02. The ALJ then clearly explained that he did not find Listing 1.02 to be met in this case because the record did not support Listing

1.02's requirement that the claimant be unable to use his upper extremities effectively. The ALJ went on to support his conclusion with evidence contemplated by the examples provided in Section 1.00B2c, such as Kevin's ability to drive, prepare light meals, and perform other daily activities. The ALJ also specifically examined Kevin's ability to reach, as discussed in the regulations, by stating that Kevin demonstrated the ability to "move both upper extremities in order to reach the table in front of him and to the side." (R. 831).[4] The ALJ's decision further illustrates that he considered whether Kevin could ambulate effectively.[5] *Id.* Thus, the ALJ named the listing, provided more than a perfunctory analysis, and constructed the requisite logical bridge in his analysis of Listing 1.02. The Court therefore finds that the ALJ's listing analysis with respect to Listing 1.02 is supported by substantial evidence.

Kevin argues that the ALJ failed to address the specific listing requirements of dysfunction, deformity, pain, limited range of motion, and abnormal imaging, and instead "oversimplified the requirements as a lost ability to perform fine and gross movements in both upper extremities." Doc. [16] at 8-9. But the ALJ in discussing Listing 1.02 acknowledged that a claimant would be found disabled if the claimant had "major dysfunction of a joint, characterized by gross anatomical deformity . . . and chronic joint

---

[4] The ALJ's clear explanation for why Section 1.00B2c was not met, which included the driving and simple meal preparation examples, is why Kevin's assertion that the "ALJ did nothing more than mention the listing and offer vague reasons" fails. *See* Doc. [16] at 9. Kevin also appears to overlook the ALJ's continued discussion of Listing 1.02 and Section 1.00B2c in the RFC portion of the decision. (*See* R. 843).

[5] Kevin states that it is "unclear" why the ALJ mentioned Kevin's ability to ambulate "in the context of assessing the severity of Plaintiff's upper extremity limitations." Doc. [16] at 9. Listing 1.02 requires an inability to use upper extremities as defined in Section 1.00B2c *or* an inability to ambulate effectively. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02. In addition, the ALJ discussed Kevin's ability to ambulate effectively not only in the context of Listing 1.02, but also in the context of Listing 1.04, which requires an inability to ambulate effectively. (R. 831); 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04.

pain . . . with signs of limitation of motion . . . and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)," so long as the claimant also had "the inability to perform fine and gross movements effectively[.]" (R. 831). Because Kevin bears the burden of proving that "all of the various criteria specified in the listing" are met, *Ribaudo*, 458 F.3d at 583, he fails to meet his burden if even just one criterion is not satisfied. Thus it is sufficient for an ALJ to focus on one listing requirement that is lacking when explaining the rejection of a listing. Kevin does not point to any law—nor is the Court aware of any—requiring the ALJ to explicitly discuss each requirement.

In any event, the ALJ discussed medical evidence relating to dysfunction, deformity, pain, limited range of motion and abnormal imaging elsewhere in his opinion, and the Court reads the ALJ's opinion as whole. *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) (citation omitted). For instance, in his RFC analysis, the ALJ discussed an August 2010 EMG/NCS which the ALJ characterized as "show[ing] bilateral median nerve entrapment at the wrist as seen as carpal tunnel syndrome [and] ulnar nerve entrapment at the elbow but no evidence for a radiculopathy." (R. 836). With respect to deformity, the ALJ considered Kevin's medical records pertaining to ulnar clawing. *Id.* at 837, 838. The ALJ likewise acknowledged Kevin's pain throughout his analysis, *see, e.g.*, *id.* at 837, 838, and observed that "[t]he record demonstrates objective clinical findings including reduced range of motion following the claimant's surgery as well as reduced motor strength in the bilateral upper extremities, and decreased sensation." *Id.* at 842-43. As a result, Kevin is wrong in claiming the ALJ did not consider the listing requirements of deformity, pain, reduced range of motion, dysfunction, and abnormal imaging.

Kevin insists that there are numerous objective findings of dysfunction, deformity, pain, limited range of motion, and abnormal imaging, which the ALJ completely ignored. Doc. [16] at 9-10. The problem with Kevin's argument is that the ALJ's decision illustrates that the ALJ reviewed the medical records containing the objective findings Kevin lists in his brief.[6] As an example, Kevin directs the Court to specific findings from the July 2011 medical records of Dr. Mehta. While the ALJ did not explicitly mention each Dr. Mehta finding cited by Kevin, it is clear that the ALJ reviewed Dr. Mehta's July 2011 records in the RFC analysis and interpreted those records as showing "some ongoing bilateral hand weakness and difficulty with fine motor activities." (*See* R. 839).

Regardless, the ALJ is not required to mention each piece of evidence in the record. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). Rather, the ALJ is required to name the listing, conduct an analysis that is more than perfunctory, and construct a logical bridge for the reviewing court. The ALJ did that here and rejected Listing 1.02, not based on a finding that Kevin did not suffer from dysfunction, deformity, or pain in his hands, but because the ALJ concluded that the record did not support an inability to use the bilateral upper extremities and hands effectively, as set forth in Section 1.00B2c. (R. 843). While it is true that the objective findings cited by Kevin would appear to indicate limitations in his ability to use his upper extremities, the ALJ weighed the evidence and

---

[6] This is true with one exception. It is unclear from the ALJ's decision whether he reviewed the file containing the December 30, 2010 CT scan of the cervical and thoracic spine, which Kevin claims "revealed bony fusion at C3-4 and bony eroding or resection of the spinous portions of the spinous processes of C6, C7, and T1, with marked left-sided degenerative facet arthropathy at C2-3." Doc. [16] at 9. Even so, the ALJ reviewed Dr. Dewald's subsequent treatment record reviewing Kevin's CT scan: "On January 10, 2011, Dr. Dewald noted that a CT scan had shown no obvious nerve compression." (R. 837). Thus, any potential error in the ALJ not discussing the 2010 CT would appear harmless.

concluded that Section 1.00B2c was not satisfied. It is not the Court's job to reweigh the evidence.

Kevin's other argument that the ALJ's listing analysis was improper because the ALJ "cited only to subjective, non-medical observations" similarly fails to persuade the Court.[7] Doc. [16] at 9. To begin, the ALJ did discuss objective medical findings in his continued discussion of Listing 1.02 (located in his RFC analysis), including the treatment notes of Dr. Mehta and Dr. Jones. (*See* R. 843). Moreover, Listing 1.02 and Section 1.00B2c contemplate the examination of subjective, non-medical observations. Again, the ALJ rejected Listing 1.02 because he found that Kevin did not have "[i]nvolvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), *resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.*" 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02 (emphasis added); (*see* R. 831). Section 1.00B2c defines the inability to perform fine and gross movements effectively as "an extreme loss of functions of both upper extremities . . . that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities" and provides examples of individuals incapable of using their upper extremities effectively, such as "the inability to prepare a simple meal and feed oneself." 20 CFR Pt. 404, Subpt. P, App. 1, § 1.00B2c. Because the listing itself incorporates the ability to complete activities of daily living as a litmus test for meeting the listing, the Court does not find it problematic that the ALJ relied on Kevin's ability to drive and prepare simple

---

[7] To the extent that Kevin's concern surrounds the ALJ's in-person observation that Kevin could "move both upper extremities in order to reach the table in front of him and to the side," (R. 843), the Court is also troubled. While the Court nevertheless finds that the ALJ's listing analysis was adequate in this case, the ALJ's playing doctor from the bench nearly six years after Kevin's last insured date is one of the reasons that the ALJ's subjective symptom analysis was patently wrong, as discussed below.

meals as support for his finding that Listing 1.02 is not met.[8]  In sum, the ALJ weighed the evidence, performed more than a perfunctory analysis, and the Court can easily trace the ALJ's reasoning.  The Court accordingly finds no error in the ALJ's Listing 1.02 analysis.

**B.      Concentration, Persistence, or Pace**

The ALJ found that Kevin had moderate limitations in concentrating, persisting, or maintaining pace. (R. 832).   In his mental impairment analysis at step three, the ALJ discussed, among other things, Kevin's problems with memory, anger, and depression, as well as Kevin's ability to perform simple calculations. *Id.*  The ALJ later picked up his mental impairment analysis again in the RFC portion of his decision, reviewing Kevin's mental health treatment from roughly 2010 to 2017. *See id.* at 841-42.  Then the ALJ explained how he accommodated Kevin's moderate limitations into his RFC. *Id.* at 844. At Kevin's hearing, the ALJ constructed hypotheticals to the vocational expert that included those limitations in concentration, persistence, or pace. *Id*. at 897-99.

Both an ALJ's RFC and hypothetical question must incorporate any limitations supported by the claimant's medical record, including specifically identified limitations in concentration, persistence, or pace. *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014); *DeCamp v. Berryhill*, 916 F.3d 671, 675 (7th Cir. 2019) (per curiam).  The Seventh Circuit recently highlighted the "recurring error" that happens when an ALJ simply limits a claimant to "unskilled work" in order to incorporate a claimant's full range of limitations in concentration, persistence, or pace. *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020) (collecting cases); *see also O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010)

---

[8] That is not to say that the ALJ's treatment of daily activities was proper with respect to the ALJ's subjective symptom analysis.  However the Court addresses that concern in the final section of this opinion.

(citation omitted) ("In most cases . . . employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace."). The Seventh Circuit has "labored mightily to explain" that the "the relative difficulty of a specific job assignment does not necessarily correlate with a claimant's ability to stay on task or perform at the speed required by a particular workplace." *Martin*, 950 F.3d at 373 (citation omitted). That being said, "[t]he law does not require ALJs to use certain words, or to refrain from using others, to describe the pace at which a claimant is able to work." *Id.* at 374 (citation omitted). Rather, the law requires that the ALJ "account for the totality of a claimant's limitations in determining the proper RFC." *Id.* (internal quotation marks and citations omitted).

In this case, the ALJ did so account for Kevin's limitations in concentration, persistence, or pace. As the ALJ explained, he accommodated Kevin's mental impairments in several ways:

> In reviewing the objective medical record in its entirety, I am persuaded that the claimant's mental impairments cause moderate limitations and he has been limited to simple, routine tasks, work involving no more than simple decision-making, no more than occasional and minor changes in the work setting, and work requiring the exercise of only simple judgment. He has further been limited to work at an average production pace, but not at a significantly above average or highly variable pace, and is found to be unable to work in crowded, hectic environments.

(R. 844). A far cry from an RFC "generically confining [a] claimant[] to 'routine tasks and limited interactions with others,'" *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) (citation omitted), the ALJ carefully tailored Kevin's RFC to accommodate his limitations in concentration, persistence, or pace. Instead of merely limiting Kevin to "simple, routine

tasks," the ALJ specified that Kevin's occupation should involve only simple decision-making and that his work environment should remain constant, with no more than occasional or minor changes. Instead of simply restricting Kevin's interaction with the public, the ALJ more precisely identified crowded, hectic environments as being problematic for Kevin. The ALJ thus avoided the pitfall of a barebones mental RFC construction.

The ALJ's mental RFC was, moreover, supported by the record. The ALJ found that Kevin had moderate limitations in concentration, persistence, or pace, based on Kevin's complaints of memory problems, anger, frustration, and depression, in addition to the results of Kevin's consultative psychological evaluation. (R. 832). The ALJ acknowledged Kevin's claims that he could not handle finances or finish tasks, and that he had trouble following instructions. *Id.* The ALJ also took into consideration Kevin's wife's statement that Kevin had to drop his classes at a community college because he could not handle the course work. *Id.* The ALJ's finding was additionally backed by the state agency physicians, who, too, concluded that Kevin had moderate limitations in concentration, persistence, or pace. *Id.* at 844. The ALJ gave great weight to those opinions, weighed the opinions of Kevin's therapists, and reviewed Kevin's mental health treatment history. His finding that Kevin had moderate limitations in concentration, persistence, or pace was therefore supported by substantial evidence.

Having reasonably found that Kevin had moderate limitations in concentration, persistence, or pace, the ALJ issued RFC restrictions that were also supported by the record. For example, the ALJ's limitation of simple, routine tasks with simple decision-making was consistent with Kevin's reported problems with memory and concentration in

2010 and 2011, which the ALJ discussed. (R. 836). The simple tasks and decision-making limitation was likewise consistent with Kevin's consultative psychological examination in March of 2011, which the ALJ described as showing that "[Kevin's] thought process was logical and sequential but the claimant exhibited problems maintaining a consistent level of attention and concentration throughout the evaluation." *Id.* at 842. The ALJ expressly gave great weight to the state agency physicians, who reviewed the consultative examination results and Kevin's medical record: "[G]reat weight is accorded to the DDS physicians' opinions . . . DDS physician Tyrone Hollerauer . . . opined that the claimant could not perform detailed tasks on a persistent basis and would be limited to simple unskilled tasks." *Id.* at 844. *See Burmester*, 920 F.3d at 511 (citation omitted) ("[A]n ALJ may reasonably rely upon the opinion of a medical expert who translates [moderate concentration, persistence, or pace] findings into an RFC determination."); *Johansen v. Barnhart*, 314 F.3d 283, 288-89 (7th Cir. 2002) (no error where physician translated moderate mental limitations into a specific RFC assessment that the plaintiff could still perform low-stress, repetitive work). The ALJ's limitation that Kevin work at an average production pace also appears to stem from the state agency physicians' mental RFC: "DDS physician Tyrone Hollerauer, Psy.D. opined that the claimant could tolerate normal work pressures but would have difficulty doing tasks requiring rapid reactions or increased speed or performance." *Id.* at 844. And, as the ALJ explained, the crowd restriction originated from Kevin's reports that he had difficulty in crowds, which the ALJ discussed throughout his decision. *Id.* at 833, 842, 843. Hence, the ALJ's RFC restrictions pertaining to Kevin's mental impairments were supported by substantial evidence in the record.

Kevin argues that the ALJ failed to properly account for all of Kevin's limitations in social functioning, concentration, persistence, or pace. Doc. [16] at 10-13. More specifically, Kevin claims that the ALJ's Paragraph B analysis at step three showed that he failed to adequately consider how Kevin's limitations in concentration, persistence, or pace would impact Kevin's ability to work. *Id.* at 11. Kevin further takes issue with the ALJ's hectic crowd restriction, which Kevin asserts is non-specific and inadequate. *Id.* at 12. Kevin summarized his concentration, persistence, or pace arguments as follows:

> The bottom line is this: the ALJ failed provide any meaningful analysis; he not only failed to explain why he found Plaintiff's myriad limitations to be only moderate, but he failed to explain how his RFC assessment adequately accommodated them. Lastly, finding only moderate limitation in adapting or managing oneself, the ALJ again acknowledged problems with crowds as well as anger and frustration, but asserted he accommodated these issues by limiting his interactions and limiting him to work requiring [no] more than simple judgment or average work pace. Contrary to the ALJ's assertion, this minor limitation does not go far enough to accommodate Plaintiff's deficits.

*Id.* Kevin's arguments fall short for at least four primary reasons.

First, Kevin, once again, fails to read the ALJ's decision as a whole. He argues that the ALJ did not discuss any facts indicating that Kevin had limitations in concentration, persistence, or pace, while focusing on the ALJ's Paragraph B analysis at step three. Doc. [16] at 11. But the ALJ discussed Kevin's testimony and medical history at length in his RFC analysis, including Kevin's reports of problems with memory, concentration, depression, anger, panic attacks, and more. (R. 834-35, 841-44). In a similar vein, Kevin argues that the ALJ's statement in his Section B analysis that there was no cognitive testing in the record was misleading because Kevin was prescribed cognitive therapy for symptoms of depression, PTSD, and anxiety, and because he was treated by Ms.

DeFrancisco for those issues "well into 2017." Doc. [16] at 11. Even if the ALJ's statement about cognitive testing were somehow misleading, the ALJ thoroughly reviewed Kevin's treatment relationship with Ms. DeFrancisco, as well as his treatment for depression, PTSD, and anxiety, so any misstatement would be harmless. (R. 841-44, 845). Kevin's assertion that the ALJ failed to consider evidence indicating that Kevin had limitations in concentration, persistence, or pace thus falls short.

The second problem with Kevin's mental RFC arguments is that he repeatedly mischaracterizes the ALJ's decision. As an example, Kevin alleges that the ALJ's only accommodation for Kevin's mental limitations was to limit Kevin to unskilled work with no work in crowded hectic environments. Doc. [16] at 12. As discussed above, that is not accurate. The ALJ accommodated Kevin's mental limitations in several ways by limiting Kevin to simple, routine tasks; work involving no more than simple decision-making; no more than occasional and minor changes in work setting; work requiring exercise of simple judgment; average production pace; and no work in crowded, hectic environments. (R. 843). Another example is Kevin's incorrect statement that the ALJ "did not even mention Plaintiff's anger and frustration[.]" Doc. [16] at 13. On the contrary, by this Court's count, the ALJ mentioned Kevin's anger and/or frustration on at least seven occasions. (*See* R. 832, 833, 836, 841, 842, 844). Not only did the ALJ mention Kevin's anger and frustration, but the ALJ explained how he accommodated anger and frustration in the RFC: "The claimant has reported problems with crowds as well as some anger and frustration related to his medical condition. As such, he might have difficulty responding to demands and I have considered this when limiting his interaction with others and limiting him to work requiring [no] more than simple judgment or more than average work

pace." (R. 833).[9]  Kevin's mental RFC arguments, based on mischaracterizations of the ALJ's decision, are not persuasive.

Third, Kevin argues that the ALJ's mental RFC limitations do not sufficiently accommodate Kevin's limitations in concentration, persistence, or pace without pointing to evidence in the record supporting further limitations, and without explaining what further limitations would be appropriate.  Recently in *Jozefyk v. Berryhill*, the Seventh Circuit held that any mental RFC assessment flaw by the ALJ in that case was harmless, in part, because it was "unclear what kinds of work restrictions might address [the claimant's] limitations in concentration, persistence, or pace," due to the fact that the claimant had not hypothesized any. 923 F.3d at 498.  The *Jozefyk* court further supported its harmless error analysis with the observation that the claimant did not cite any evidence showing that his mental deficits kept him from performing work as confined by the ALJ's mental RFC. *Id.* So too here, Kevin has not explained what additional limitations should have been imposed; nor does he point to objective evidence in the record indicating that Kevin could not work within the limitations crafted by the ALJ.[10]  Kevin attacks the ALJ's crowd restriction by pontificating vaguely that "[f]or an individual such as Plaintiff, it would not

---

[9] Interestingly, Kevin elsewhere in his argument appears to concede that the ALJ discussed Kevin's frustration and anger. *See* Doc. [16] at 12 ("[T]he ALJ again acknowledged problems with crowds as well as anger and frustration, but asserted he accommodated these issues by limiting his interactions and limiting him to work requiring [no] more than simple judgment or average work pace.").

[10] To be sure, this case is not an exact duplicate of *Jozefyk*.  In *Jozefyk*, the claimant did not testify about his limitations in concentration, persistence, or pace, and the medical record did not indicate that the claimant had deficits in those areas. 923 F.3d at 498.  Here, Kevin did testify about his memory issues and discomfort with crowds, and the medical record does support moderate limitations in concentration, persistence, or pace.  Even so, Kevin's conclusory assessments of the mental RFC are sufficiently similar to the claimant's in *Jozefyk* for the case to lend persuasive support.  And, as the Commissioner observes, the case is instructive as to the Seventh Circuit's general disfavor towards a claimant's arguing that a mental RFC is not sufficiently restrictive without "showing what limitations went overlooked." Doc. [24] at 3.

take much for an environment to seem hectic . . . To Plaintiff, merely being in a room for an entire workday with a handful of other people might cause a panic reaction that is incompatible with full time work." Doc. [16] at 12. Yet Kevin's medical record does not support the supposition that being in a room with a handful of people would trigger a panic reaction for Kevin. Instead, his treatment records indicated that he avoided crowds because he was afraid of someone running into him. *Id*. at 1250. Also, in function reports from 2011, Kevin stated that he attended church and visited with neighbors regularly. *Id.* at 244, 266. Kevin similarly concludes, without support, that the ALJ's limitations of work requiring no more than simple judgment and work at average production pace "do[] not go far enough to accommodate Plaintiff's deficits," and that generally "[i]t is unrealistic to believe Plaintiff would not require further accommodation." Doc. [16] at 12, 13. Without proposing additional restrictions or illustrating that additional restrictions are warranted by the medical evidence, Kevin's conclusory attacks on the ALJ's mental RFC fall flat.

The fourth overarching problem with Kevin's mental RFC arguments is that he is essentially asking this Court to second-guess the ALJ's RFC and reweigh the evidence. It is not for this Court to say that the ALJ should have given more weight to Kevin's treatment history with Ms. DeFrancisco and less weight to the evidence that Kevin reported living with family, attending church, going shopping, teaching fitness classes, and visiting neighbors. Doc. [16] at 11-12. Nor is it this Court's place to say whether the ALJ's mental RFC limitations, such as the hectic crowd limitation or simple task restriction, are the *correct* or *best* limitations to accommodate Kevin's impairments. *Id.* at 12, 13. The Court will not reweigh the evidence or substitute its judgment for that of the ALJ's. The law required the ALJ to incorporate any mental limitations supported by Kevin's medical

record into the RFC. *Yurt*, 758 F.3d at 857. As explained above, the ALJ did so. The law also required the ALJ to avoid the "recurring error" that happens when an ALJ simply limits a claimant to "unskilled work" in order to incorporate a claimant's full range of limitations in concentration, persistence, or pace. *Martin*, 950 F.3d at 373. The ALJ avoided that error by thoroughly discussing Kevin's mental health treatment history and by expressly imposing several restrictions geared at Kevin's mental impairments. The Court sees no error in the ALJ's mental RFC construction.

One last argument by Kevin on the mental RFC, although undeveloped, merits discussion. Kevin contends that the crowd restriction is improper because the ALJ did not define the phrase "crowded, hectic environment." *See* Doc. [16] at 12, 13. While Kevin does not cite any caselaw in support of this assertion, the Court is aware that in *Varga v. Colvin*, the Seventh Circuit found it "problematic" that the ALJ in that case did not define an RFC limitation of "fast paced production." 794 F.3d 809, 815 (7th Cir. 2015). According to the *Varga* Court, the lack of a definition made it "impossible for the VE to assess whether a person with [the claimant's] limitations could maintain the pace proposed." *Id.* Here, the ALJ's "crowded, hectic environment" restriction does not suffer from the *Varga* problem. The ALJ provided further specification as to what he meant by "crowded, hectic environment" in his questioning to the vocational expert: "I don't want the individual working in crowded hectic environments, such as carnivals, street fairs or even on the floor of busy restaurants and stores during public hours." (R. 898). When the vocational expert offered the job of usher, a job that appeared to be in tension with the ALJ's crowd restriction, the ALJ communicated his concern to the vocational expert and ultimately rejected the inconsistent job. *Id.* at 898-99; *see id.* at 898 ("That first job of usher

– and why did you identify that, in light of my comment about crowded and hectic environments?").  As a result, the Court does not find that the "crowded, hectic environment" restriction was erringly vague.  The ALJ was sufficiently specific and was able to communicate his specifications to the vocational expert.  Kevin's argument that the ALJ needed to further define his crowd restriction, like Kevin's other arguments, fail to persuade the Court that the ALJ erred in constructing the mental RFC.  The ALJ accounted for the mental impairments supported by the record.

## C.    Opinion Evidence

Kevin contends, in one paragraph, that the ALJ's assessment of opinion evidence is unsupportable. Doc. [16] at 15-16.  More precisely, Kevin takes issue with the ALJ's weighing of the state agency physicians, Kevin's social worker, and Dr. Dewald's opinion that Kevin was disabled.[11] *Id.*  Because the ALJ's weighing of each of the aforementioned sources is supported by substantial evidence, Kevin's argument is unsuccessful.

When evaluating a claimant's medical record, an ALJ "is required to determine which treating and examining doctors' opinions should receive weight and must explain the reasons for that finding." *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1527(d), (f)).  The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record" 20 C.F.R. § 404.1527(c)(2); *Kaminski v. Berryhill*, 894 F.3d 870, 874 n.1 (7th Cir. 2018) (for

---

[11] Kevin also includes a general, conclusory argument that "the ALJ did not do anything to explain why he assigned [the treating sources] relatively little." Doc. [16] at 15.  Kevin had numerous treating physicians, and the ALJ's analysis of the opinion evidence spans at least two pages. Kevin's unsupported statement therefore fails to raise a reviewable issue for the Court. *United States v. Cisneros*, 846 F.3d 972, 978 (7th Cir. 2017).

claims filed before March 27, 2017, an ALJ "should give controlling weight to the treating physician's opinion as long as it is supported by medical findings and consistent with substantial evidence in the record."). An ALJ must "offer good reasons for discounting a treating physician's opinion." *Campbell v. Astrue,* 627 F.3d 299, 306 (7th Cir. 2010) (citations omitted); *see also Walker v. Berryhill,* 900 F.3d 479, 485 (7th Cir. 2018) (citations omitted).

Kevin begins by critiquing the ALJ's weighing of the state agency physicians. He argues that the ALJ gave the state agency physicians great weight "without offering anything other than the most vague reasons." Doc. [16] at 15. Kevin also asserts that the state agency physicians' mental health limitations were inconsistent with the ALJ's assessment. *Id.* Contrary to Kevin's claim, the ALJ clearly explained why he gave great weight to the state agency physicians' opinions, including the fact that their opinions were "generally consistent with the expanded record including mental health treatment records" and included citations to "evidence in the medical record," including "the findings at the consultative examination [from March 2011] . . . and treatment records from physical therapy." (R. 844-45). Those explanations are sufficient for the Court to trace the ALJ's reasoning, so the ALJ has done enough. *See Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985. As to Kevin's assertion that the state agency physicians' opinions were inconsistent with the ALJ's assessment of mental impairments, Kevin does not explain the inconsistency, and none is readily apparent to the Court. As discussed above, the state agency physicians' opinions supported both the ALJ's finding that Kevin had moderate limitations in concentration, persistence, or pace, and the limitations the ALJ included in the mental RFC. The only potential inconsistencies between the state agency physicians'

assessment and the ALJ's that the Court sees actually benefit Kevin. That is, the ALJ's mental RFC is more restrictive than that of the state agency physicians. As a result, any inconsistency is unhelpful to Kevin's position.

Kevin's next allegation is that the ALJ assessed the mental disorder report prepared by Kevin's social worker "in a piecemeal fashion" assigning "some weight to parts of it and no weight to others." Doc. [16] at 15. Kevin argues that that weighing is "indicative of a failure to assess the reliability of the source," as well as "an impermissible tendency to instead play doctor." *Id.* As best as the Court can tell, Kevin's arguments pertains to the ALJ's weighing of Linda DeFrancisco's mental disorders report from June 2011. (R. 845). In that assessment, the ALJ found some of Ms. DeFrancisco's findings to be "generally consistent with [her] treatment notes," including her findings that Kevin had had anxiety around groups of people and decreased short-term memory. *Id.* Because the ALJ found those portions of Ms. DeFrancisco's report to be consistent with the record, he accorded them some weight. *Id.* Whereas the ALJ gave no significant weight to the "multiple marked and extreme limitations assessed" in her report because there was "no evidence in the objective medical record to support" those levels of limitation. *Id.* Kevin fails to point to any law requiring an ALJ to give the same weight to each of a source's findings, and it seems appropriate that an ALJ would give greater weight to specific findings supported by the record while granting less weight to unsupported, outlier opinions. Along those same lines, Kevin does not explain how the ALJ played doctor in his assessment of Ms. DeFrancisco, and the Court is at a loss. At any rate, Ms. DeFrancisco, as a licensed clinical professional counselor, or LCPC, and is not an "acceptable medical source." *See* SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006); *Williams v. Colvin*, No. 14 C 5075, 2015

WL 5227736, at *5 (N.D. Ill. Sept. 4, 2015) (citations omitted); *Compton v. Colvin*, No. 11 C 8305, 2013 WL 870606, at *10 (N.D. Ill. Mar. 7, 2013) (collecting cases). As a result, her report does not constitute a "medical opinion," *see* 20 C.F.R. § 404.1527(a)(1), and report was not entitled to any special weight or deference, as only an "acceptable medical source" can be a "treating source." *See* 20 C.F.R. § 404.1527(a)(2). Rather, the law allowed the ALJ to consider Ms. DeFrancisco's opinions to assess the severity of Kevin's impairments on his ability to work, and that is what the ALJ did. SSR 06-03p, 2006 WL 2329939, at *2; *see also* 20 C.F.R. §§ 404.1527(f)(1) (ALJs may consider opinions from medical sources who are not acceptable medical sources using the same factors in §§ 404.1527(c)(1)-(6)).

Kevin's final criticism regards the ALJ's weighing of Dr. Dewald's December 2012 opinion that Kevin was disabled due to his lack of upper extremity ability. Kevin insists that the ALJ "assigned considerable weight to Dr. Dewald's opinion regarding hand limitations, but nevertheless rejected his opinion that they were disabling." Doc. [16] at 15-16. Kevin calls the ALJ's rejection of Dr. Dewald's disability opinion an "anomaly" that there is no explanation for. *Id.* at 16. Yet, the ALJ provided the explanation that Kevin seeks, and it is one grounded in law. As the ALJ explained, even though Dr. Dewald's opinion was cursory and did not provide specific functional limitations, the ALJ gave the opinion considerable weight because the "record supports that the claimant has ongoing hand limitations." (R. 846). However, the ALJ rejected the specific statement within the cited medical record that Kevin was "completely disabled," because that statement was "not entitled to any significant weight." *Id.* Indeed, "the ALJ is not required to give controlling weight to the ultimate conclusion of disability—a finding specifically reserved

for the Commissioner." *Denton v. Astrue*, 596 F.3d 419, 424 (7th Cir. 2010) (citations omitted); *see also* 20 C.F.R. § 404.1527(d)(1). The ALJ thus provided a good reason for rejecting Dr. Dewald's legal conclusion, an opinion that was not entitled to any special weight or deference. Kevin has failed to identify a reversible error in the ALJ's weighing of medical opinions.

## D.     Subjective Symptom Evaluation

Kevin also challenges the ALJ's subjective symptom analysis. The Court will overturn an ALJ's evaluation of a claimant's subjective symptom allegations only if it is "patently wrong." *Burmester*, 920 F.3d at 510. An ALJ must justify his evaluation with "specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (citation omitted); *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (citation omitted) (patently wrong "means that the decision lacks any explanation or support."). When assessing a claimant's subjective symptom allegations, an ALJ must consider several factors, including the objective medical evidence, the claimant's daily activities, his level of pain or symptoms, aggravating factors, medication, course of treatment, and functional limitations. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *5, 7-8 (Oct. 25, 2017). However, the ALJ "may not simply recite the factors that are described in the regulations," for, "[w]ithout an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942 (internal quotation marks and citations omitted) (remanding where ALJ's decision discrediting claimant's testimony was insufficient to support denial of claim without some specific reasons or explanation for discrediting testimony). Ultimately, "the ALJ must explain her [subjective symptom evaluation] in such a way that allows [the

Court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Murphy*, 759 F.3d at 816 (internal quotation marks and citation omitted).

In this case, Kevin's testimony spanned two hearings and chronicled numerous physical and mental limitations. Kevin testified about his struggles working as a part-time fitness instructor—four hours per week—around the time of his onset date, specifically that he struggled with punctuality due to his issues with tying his shoes and turning the key in his car. (R. 870). Kevin also stated that he was only able to get halfway through a fitness class before experiencing what felt like lightning bolts running down his arms into his hands. *Id.* According to Kevin, his hand pain got worse, and he gradually reduced his hours until stopping work as a fitness instructor altogether in November 2010, at the time of his spinal surgery. *Id.* at 870-71. Kevin described the surgery and the aftermath of that surgery, explaining that after his surgery his pain was located in both arms, that he has to reach for things slowly, and that he has tried several pain medications and physical therapy to no avail. *Id*. at 872, 874. Kevin further testified about the limitations in his hands, including his previous use of hand braces, the pain he experiences in gripping and opening jars, and his purported inability to use his hands for writing, typing, buttons, or zippers. *Id.* at 876-78. Kevin stated that he could only lift a gallon of milk if he held it close to his body and did not have to transport it very far. *Id.* at 878. Kevin also commented on his issues with standing and walking. *Id.* at 836. For instance, Kevin testified that he that he wants to sit down after standing up for a half an hour and that on a typical day he lies down more than 50% of the day. *Id.* at 879-80. On the mental limitations front, Kevin claimed that he experiences six panic attacks daily, that he has been seeing a mental health provider for

years without relief, that he has suffered from memory and concentration problems, and that he was prescribed psychotropic medications, which caused significant anger. *Id.* at 882-86. With respect to activities of daily living, Kevin testified that after 2010, he could not cook due to his inability to hold and control kitchen utensils; Kevin also could not feel heat, cold, or cuts on his skin. *Id.* at 886-87. Kevin recalled that he would cut himself and not know it until he saw a trail of blood following him across the room. *Id.* He also could not perform chores after 2010, due to the risk of burning or cutting himself and his inability to grip appliances, such as a vacuum cleaner. *Id.* at 887. Kevin testified that he spent most of his time watching television, but that he would often have to rewind programs because he would forget what he saw after about fifteen minutes of watching. *Id.* at 888. He also said that he had difficulty with shaving, bathing, and sleeping. *Id.* at 889. Kevin stated that he was able to drive three to four times per week at most in the relevant time period, but that those trips were limited to driving to work and going with his wife to the store. *Id.* at 889-90. This testimony, if believed, seriously called into question Kevin's ability to sustain fulltime work during the relevant time period.

Kevin's challenge to the ALJ's subjective symptom analysis consists primarily of four arguments. The first is an overarching claim that the ALJ failed to present analysis pursuant to SSR 16-3p. Doc. [16] at 13. The next three arguments attack the ALJ's ostensible reasons for discounting Kevin's subjective symptom allegations. The Court is mindful that credibility determinations by the ALJ are given great deference. *See Murphy*, 759 F.3d at 815-16. However, Kevin has identified multiple errors in the ALJ's subjective symptom analysis in this case, errors that the Seventh Circuit continually takes issue with.

From the outset, the Court agrees with Kevin that the ALJ's SSR 16-3p analysis is lacking. *See* Doc. [16] at 13. SSR 16-3p mandates that the ALJ's decision "contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." 2017 WL 5180304, *10. The ALJ here recited the two steps of analysis to be undertaken per SSR 16-3p, (*see* R. 834), followed that up with a sterile summary of Kevin's testimony, and ended with the meaningless boilerplate that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *Id.* at 836. Beyond that, however, the Court struggles to discern the ALJ's analysis regarding Kevin's subjective symptom allegations, even when reading the ALJ's decision as a whole. It is not clear which subjective symptom allegations the ALJ discredited, nor what his reasons for discounting Kevin's testimony were. If the Court scrapes the barrel of the ALJ's decision, only three apparent reasons for discounting Kevin's testimony emerge: (1) Kevin's declining of occupational therapy in 2011; (2) Kevin's ability to drive, prepare light meals, and perform daily activities; and (3) Kevin's showing improvement after 2011. *Id.* at 843. Ultimately, even if the Court has interpreted the ALJ's decision correctly, Kevin has shown that these apparent reasons are invalid.

Taking them in reverse order, the Court begins with the ALJ's focus on Kevin's purported improvement. Near the end of his RFC analysis, the ALJ observed that while the claimant continued to struggle with hand limitations, the record showed that Kevin's condition improved after 2011: "[I]t is noted that while the claimant continued to

demonstrate hand weakness and limitations in motor functioning, the record shows some improvement after 2011[.]" (R. 843). In support of his post-2011 improvement conclusion, the ALJ cited to two treatment records from Dr. Dorothy Jones, one from April 2014 and one from January 2015. *See id.* at 843, 1184, 1188. The ALJ then pointed to his in-court observations of Kevin:

> At the hearing, the claimant was observed to be able to reach the table in front of him as well as to the sides, but he testified that this would be painful if he tried to reach further. He was also able to open his hand but stated that this was painful. I acknowledge that the claimant shifted his shoulders while seated, but did so fluidly giving no sign of pain. Additionally he was able to testify clearly and appropriately without evidence of pain behavior.

(R. 843). Kevin combats the ALJ's post-2011 basis for discounting his testimony, reasoning that improvement is "meaningless" and that the ALJ's lay observations are insufficient to overcome the objective evidence in the record showing that Kevin's condition was not improving. Doc. [16] at 14-15. The Commissioner offers no arguments in response, and the Court agrees.

As an initial matter, the ALJ's improvement analysis reeks of the disfavored "sit and squirm test." An ALJ "may not discredit a claimant's testimony simply because the claimant failed to 'sit and squirm.'" *Flores v. Massanari*, 19 F. App'x 393, 404 (7th Cir. 2001) (citation omitted). In *Powers v. Apfel*, the ALJ found claimant's allegation that claimant could not sit for more than ten minutes without severe pain to be inconsistent with the ALJ's observation of the claimant during the hearing, which lasted for more than ten minutes, during which time the claimant did not show signs of discomfort. 207 F.3d 431, 436 (7th Cir. 2000). In reviewing the ALJ's conclusion, the *Powers* Court observed that many courts have "condemned" the sit and squirm test and stated that the Seventh Circuit

was "uncomfortable with it as well." *Id.* (citations omitted). In particular, the court "doubt[ed] the probative value of any evidence that can be so easily manipulated as watching whether someone *acts* like they are in discomfort." *Id.* (emphasis in original).[12]

Here, the ALJ's use of the sit and squirm test is especially unsettling. During the hearing, the ALJ observed Kevin moving his arms, and in a "gotcha" moment reminiscent of Perry Mason, interrupted Kevin's direct examination by saying, "Excuse me just a moment. You said something about moving or reaching your arms slowly and I – I'm just noticing, you're moving both of your arms." (R. 875). Kevin explained that reaching his arms out beyond the tabletop in front of him, which he had not done, would cause pain. *Id.* at 875-76. Kevin subsequently testified that when hand braces proved too painful, his doctors instructed him to lay his hands flat on the table once an hour, and that opening his hand and gripping large objects was painful. *Id.* at 876-77. The ALJ interrupted once more: "But now, as you were demonstrating it, you did open your hand. You weren't pressing it on the table. You opened your hand." *Id.* at 877. Not only did the ALJ use these two isolated observations of Kevin at a hearing that took a little over an hour to discredit Kevin's pain allegations, but he also played doctor by using his lay observations of Kevin's ability to reach to construct Kevin's RFC. *See id.* at 833 ("He has no limitation in his ability

---

[12] In the end, the Seventh Circuit upheld the ALJ's credibility determination in *Powers* because the ALJ "had an opportunity to observe Powers for an extended period of time and could gauge whether her demeanor, behavior, attitude and other characteristics suggested frankness and honesty and were consistent with the general bearing of someone who is experiencing severe pain." 207 F.3d at 436. The *Powers* case nevertheless exemplifies the Seventh Circuit's disapproval for the "sit and squirm test," and courts in this Circuit have since found that ALJs using the test have failed to build accurate and logical bridges in their subjective symptom analyses. *See, e.g.*, *Flores*, 19 F. App'x at 404; *D'Aversa v. Berryhill*, No. 18 C 843, 2018 WL 5977919, at *2 (N.D. Ill. Nov. 14, 2018); *Klug v. Berryhill*, No. 1:17-CV-145-TLS, 2018 WL 2197904, at *4 (N.D. Ind. May 14, 2018).

to reach up to 75% of the normal range of motion in all directions.  He can reach from 75% to 100% of normal range of motion in all directions.").

What's more is that this hearing took place in February 2017, nearly six years after the end of the relevant time period.  As a result, the timing of the ALJ's observations reduces any probative value of his sit and squirm test to zero.  Put another way, even if the ALJ were qualified to opine that Kevin had improved by 2017 based on his in-court observations, that improvement would not be indicative of what Kevin's symptoms were like from March 2010 to March 2011. *See Million v. Astrue*, 260 F. App'x 918, 921-22 (7th Cir. 2008) (explaining that medical records after the date of last insured were "relevant only to the degree that they shed light on [the claimant's] impairments and disabilities from the relevant insured period").

For similar reasons, the ALJ's citation to medical records from 2014 and 2015 is unavailing.  In neither page cited by the ALJ did Dr. Jones opine that Kevin's condition was improving, and the ALJ is not qualified to draw that conclusion from raw medical records. *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir.1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."); *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014), *as amended on denial of reh'g* (Oct. 24, 2014) (remanding decision of ALJ who improperly played doctor by relying on unremarkable MRI to conclude that claimant's migraines were not a significant problem).  In fact, in the annual exam cited by the ALJ from April 2014, Dr. Jones diagnosed Kevin with bilateral arm weakness, gout, depression, cervical myelopathy, and asthma attacks, concluding "I fully support his need for disability and inability to work." (R. 1186-87).  Again, even if Dr. Jones had concluded Kevin's condition was improving in April 2014, that would still

be three years after the relevant time period in this case, and therefore as Kevin says, meaningless. Simply put, the ALJ's post-2011 basis for discrediting Kevin is unacceptable because Kevin's improvement after 2011 is irrelevant, and because the ALJ used the sit and squirm test and otherwise played doctor to conclude that Kevin improved after 2011.

The ALJ's recitation of Kevin's activities of daily living fares no better. The ALJ briefly "noted" that Kevin "described problems using the hands but admitted to an ability to drive, prepare light meals, and perform daily activities during this time." (R. 843). While daily activities may be used to discredit a claimant's testimony, *see Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) (citations omitted), the Seventh Circuit has denounced decisions which fail to recognize the "critical differences" between activities of daily living and activities in a full-time job, such as flexibility in scheduling, getting help from others, and not being held to a minimum standard of performance. *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). *See also Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020) (remanding where claimant's ability to do limited work to maintain his small farm did not adequately support ALJ's conclusion that he would be able to work full time). "Without acknowledging the differences between the demands of such activities and those of a full-time job, the ALJ [is] not entitled to use [the claimant's] performance of life activities as a basis to determine that [his] claims of a disabling condition [are] not credible." *Ghiselli v. Colvin*, 837 F.3d 771, 777-78 (7th Cir. 2016). For instance in *Cullinan v. Berryhill*, the Seventh Circuit remanded the decision of an ALJ who drew an "impermissible inference[]" by relying on a claimant's ability to perform household chores without explaining "why doing [the] household chores was inconsistent with [claimant's] description of [ ] pain and

limited mobility," and where no inconsistency was obvious. 878 F.3d 598, 603 (7th Cir. 2017).

Here, the ALJ overemphasized Kevin's daily activities without acknowledging the differences between such activities and the ability to sustain fulltime work. Like in *Cullinan*, the ALJ noted Kevin's ability to drive, prepare simple meals, and engage in daily activities to discredit Kevin's testimony without explaining why those activities are inconsistent with Kevin's allegations regarding the severity of his hand limitations. Also like in *Cullinan*, no inconsistencies are apparent. For instance, Kevin testified that from 2010 to 2011 he would drive four times a week at the most, to drive to his job (five minutes away) or with his wife to go to the store. (R. 889-90). At the hearing, the ALJ asked Kevin whether he still drove, and Kevin explained that he could drive for about a half an hour before the pain becomes unbearable. *Id.* at 891. The Court accordingly sees no inconsistency between Kevin's testimony that he drove short distances no more than 4 times a week during the relevant time period and no more than a half hour at a time in 2017 to be inconsistent with his pain allegations.

As for his ability to prepare meals, Kevin testified that after his surgery in 2010 he could not cook his own meals because he could not hold and control utensils, and because he had an insensitivity in his hands, which could lead him to burning or cutting himself without his knowing. *Id.* at 886-87. He also testified that his wife got him some "clip on gadgets" to use with his utensils. *Id.* at 887. At his original hearing in 2012, Kevin similarly stated that he could manage "finger foods," but that his doctors would not allow him to cook or do dishes because he could "cut a finger off or burn something and not know it." *Id.* at 51. This testimony is consistent with Kevin's function reports from 2011, in which

he reported that he could not cook, but that he could prepare simple things like instant oatmeal, a cup of tea, or frozen meals if he was home alone. *Id.* at 242, 264. There is no clash that the Court can see between Kevin's ability to prepare simple meals like oatmeal and his allegations of hand limitations.

An inconsistency is even less apparent with respect to the ALJ's vague statement that Kevin admitted to an "ability to . . . perform daily activities[.]" *Id.* at 843. First off, the Court does not understand what activities the ALJ is referring to when he says "daily activities," so the Court cannot determine whether the ALJ "reached [his] decision in a rational manner, logically based on [his] specific findings and the evidence in the record." *Murphy*, 759 F.3d at 816 (internal quotations omitted). Moreover, Kevin's testimony largely revolved around what he *could not do* in a day during the relevant time period, or what he struggled through despite his limitations: he could not perform any chores, had difficulties with self-care and sleeping, rarely grocery shopped alone, and struggled to socialize. *Id.* at 884-889. From what the Court can tell, Kevin's only admitted daily activity was watching a lot of television. *Id.* at 888. Kevin's ability to watch television and his struggle through self-care do not conflict with his claims regarding the severity of his hand limitations. Because the ALJ failed to explain the inconsistencies between Kevin's activities of daily living, and none are evident from the record, the ALJ's one-liner about activities of daily living is another invalid reason for discounting Kevin's testimony.

Although not raised by the Commissioner, the Court acknowledges that the ALJ did not explicitly state that he was equating Kevin's ability to perform daily activities to the ability to sustain fulltime work. *See Morrison v. Saul*, No. 19-2028, 2020 WL 1158480, at *5 (7th Cir. Mar. 10, 2020) (finding discussion of daily living activities in subjective

symptom analysis proper where ALJ did not equate claimant's activities of daily living with an ability to work-full time but rather found claimant's admitted activities were not entirely consistent with the level of limitation alleged given claimant's receiving only conservative treatment for impairments).  At the same time, the ALJ did not state that he was *not equating* Kevin's activities of daily living with the ability to sustain full-time work, and it is entirely unclear from the record and the ALJ's decision why the ALJ emphasized Kevin's daily activities.  So, in any case, the ALJ failed to construct an accurate and logical bridge for this Court to follow in his discussion of Kevin's daily activities. *See Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (requiring ALJ conducting credibility analysis to "build an accurate and logical bridge from the evidence to [the] conclusion").

Turning to Kevin's declining of occupational therapy in 2011, Kevin argues that there may be any number of legitimate reasons to decline certain kinds of treatment, and that "ALJs must explore any facts that may explain such a decision." Doc. [16] at 14 (citing *Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014)).[13]  The Seventh Circuit has held that an ALJ may not draw any negative inferences from a claimant's noncompliance with treatment without first exploring the reasons for that noncompliance. *See, e.g.*, *Beardsley*, 758 F.3d at 840 (internal quotation marks and citations omitted) ("ALJ may not draw any inferences about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care"); *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013) (citation omitted) ("[A]n ALJ must inquire as to why a claimant missed an appointment before drawing a negative inference from her failure to attend."); *Shauger v. Astrue*, 675 F.3d 690 (7th Cir. 2012) (remanding decision of ALJ who

---

[13] The Commissioner's brief is silent on this noncompliance issue as well.

discredited claimant's testimony regarding severity of headaches caused by nerve palsy based on perceived gaps in treatment where ALJ did not question claimant about such gaps). Here, the ALJ stated that he was not pointing to Kevin's choice as a reason for discrediting Kevin's claims of symptoms: "[T]his is not found to imply that the claimant was not experiencing valid symptomatology[.]" (R. 843). Yet he also stated that Kevin's declining of occupational therapy "strongly suggest[s] that he was experiencing a satisfactory level of functioning, despite continued limitations," which seems to suggest that the ALJ did view Kevin's declining of physical therapy to undermine his subjective symptom allegations. *Id.* And while the ALJ mentioned Kevin's 2011 explanation for not pursuing occupational therapy, *see id.* at 839 ("He was also recommended for occupational therapy. However, the claimant declined this treatment and expressed that he would be able to adapt to his weakness with adaptive devices."), the ALJ did not question Kevin at his hearing regarding his declining of occupational therapy. The Court therefore finds that the ALJ's focus on Kevin's declining of occupational therapy was another unacceptable reason for discounting Kevin's testimony.

The Commissioner claims that the ALJ's subjective symptom analysis should be upheld "because the ALJ provided more than a few valid reasons for discounting plaintiff's allegations." Doc. [24] at 8. In support of its argument, the Commissioner cites *Halsell v. Astrue*, 357 F. App'x 717, 722 (7th Cir. 2009), for the proposition that "[n]ot all of the ALJ's reasons must be valid [in a subjective evaluation] as long as enough of them are[.]" Doc. [24] at 8. The Court recognizes *Halsell* and agrees that one thorny reason is not sufficient to overturn an ALJ's subjective symptom analysis. However, the Commissioner offers up only one potential reason the ALJ had for discrediting Kevin's testimony, and it

is a reason born in violation of the *Chenery* doctrine. *See Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020) (citing *SEC v. Chenery Corp*., 318 U.S. 80, 93–95, 63 S.Ct. 454, 87 L.Ed. 626 (1943)) ("Our review is limited [ ] to the ALJ's rationales; we do not uphold an ALJ's decision by giving it different ground to stand upon."). The Commissioner claims that the ALJ "contrasted plaintiff's allegations of significant manipulative limitations to evidence from the relevant period showing improvement, including the ability to perform self-care daily activities as well as more complex activities such as preparing light meals." Doc. [24] at 7 (citing (R. 458, 837)). But the discussion cited to by the Commissioner is merely the ALJ's summary of a December 2010 treatment record; there is no indication that the summary pertained to the ALJ's subjective symptom analysis. The Commissioner has failed to show that the ALJ's decision contained sufficient valid reasons for the subjective symptom analysis to be upheld.

The Commissioner spends the rest of its brief argument trying to show that the ALJ largely credited Kevin's subjective symptom allegations. *See* Doc. [24] at 7-8. Even if the Commissioner accurately captured the extent to which the ALJ credited Kevin's testimony, the bottom line does not change. The ALJ found that Kevin's statements regarding the intensity, persistence, and limiting effects of his symptoms were "not entirely consistent" with the record, meaning he did not fully credit them. (R. 836). If he had fully credited Kevin's subjective symptom allegations, the ALJ could not have found Kevin capable of work. For example, Kevin testified that standing, walking, and sitting cause significant pain in his hands and that on a typical day he lies down more than 50% of the day. *Id.* at 879-80. The Court is not aware of any fulltime employment that would allow Kevin to lie

down to that extent. For this same reason, the Court cannot say that the ALJ's erroneous subjective symptom analysis was harmless. *See Craft*, 539 F.3d at 680.

One final argument merits discussion. The Commissioner began its subjective symptom analysis rebuttal with the following undeveloped assertion: "Plaintiff's purported challenge to the ALJ's subjective evaluation is, in actuality, another attempt to nudge the court into reweighing the evidence itself." Doc. [24] at 7. However, the Court has not reweighed the evidence. Rather, the Court has examined Kevin's arguments, which highlight numerous errors in the ALJ's subjective symptom analysis, including the ALJ's inadequately explained SSR 16-3p analysis, the ALJ's improper reliance on meaningless lay observations, and the ALJ's unexplained overemphasis on Kevin's activities of daily living. The Seventh Circuit, as discussed above, has found these errors to be worthy of remand in some cases. In this case, the Court finds that the ALJ's subjective symptom analysis errors are egregious enough to make remand necessary.

The Court is not holding that the ALJ must credit all of Kevin's subjective symptom allegations on remand. However, the ALJ should evaluate Kevin's subjective symptom allegations in accordance with SSR 16-3p by explaining which of Kevin's symptoms are found consistent or inconsistent with the evidence. The ALJ must then provide "specific reasons for the weight given to the individual's symptoms," and those reasons must "be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." 2017 WL 5180304, *10. In reassessing Kevin's subjective symptom analysis, the ALJ must also avoid overemphasizing Kevin's activities of daily living and relying on irrelevant lay observations about Kevin's condition after the relevant time period, as

discussed above. The ALJ must also refrain from discounting Kevin's subjective symptom allegations due to noncompliance, without first exploring Kevin's potential reasons for not complying or pursuing treatment.

## CONCLUSION

For these reasons, Kevin's motion for summary judgment [15] is granted in part and denied in part, and the Commissioner's motion for summary judgment [23] is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion. The Clerk is directed to enter judgment in favor of Plaintiff and against Defendant Commissioner of Social Security.

**SO ORDERED.**

Dated: May 13, 2020

Sunil R. Harjani
United States Magistrate Judge